# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 28, 2008

Charles R. Fulbruge III
Clerk

No. 07-60555

ALLSTATE LIFE INSURANCE COMPANY, successor in interest to
Glenbrook Life and Annuity Company

Plaintiff-Appellee

v.

VIRGINIA V PARNELL, Executrix of the Estate of Charles Thomas Reed and
in her individual capacity

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 1:05-CV-164

Before PRADO, ELROD, and HAYNES, Circuit Judges.

PER CURIAM:[*]

A few months before his death, Charles Thomas Reed ("Reed") purchased an annuity from an agent of a company to which Allstate Life Insurance Company ("Allstate") is the successor in interest.[1] After Reed's death, Allstate filed an interpleader action against several claimants to the annuity proceeds.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] Allstate is the successor in interest to Glenbrook Life and Annuity Company, which actually sold the annuity to Reed. For simplicity, we refer to both organizations as "Allstate."

One of the claimants, Reed's daughter, Virginia Parnell ("Parnell"), filed a counterclaim against Allstate, both individually[2] and in her capacity as executrix of Reed's estate. She alleged that Allstate acted wrongfully in selling Reed the annuity and asserted claims against Allstate for breach of fiduciary duty, fraud, civil conspiracy, unjust enrichment, unfair or deceptive trade practices, and violations of the Mississippi Vulnerable Adults Act. The district court granted summary judgment in favor of Allstate on all of Parnell's claims, and she appeals. For the following reasons, we AFFIRM.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Reed resided at the Armed Forces Retirement Home - Gulfport ("AFRH-G") until his death on January 28, 2004. In June or July of 2003, Reed met with Linda Helwick ("Helwick"), a manager at the Hancock Bank branch located in the AFRH-G who was licensed to sell Allstate fixed annuities, and mentioned that he wanted to explore investment options. Reed knew Helwick from his casual conversations with her during his weekly visits to the bank over ten years. The two discussed fixed annuities and other investments, but Reed did not make any decisions. On or around July 7, 2003, Reed met with Helwick's supervisor, Linda Madden ("Madden"), who was also licensed to sell Allstate investment products, to discuss investment options. Madden stated that Reed "seemed to be savvy on variable annuities," that he "was pretty sharp in investments," and that "he'd ask the right questions, you know, what kind of fees are involved, what kind of charges would the funds have if I decided to go into those." She also stated that "he was real quick, anytime I got into any of his personal questions like what are you worth, what kind of income have you got,

---

[2] Parnell failed to demonstrate that she had standing to sue individually, given that all allegations centered on alleged duties to and harm befalling Reed. The Estate of Reed, of course, has standing; Parnell, in her capacity as executrix of his estate, is the proper party to assert Reed's claims. In addition, Parnell conceded at oral argument that her claims were in her capacity as executrix of the estate. We assess her claims in that light.

to cut me off." Madden told Reed about an annuity with a seven percent rate that Allstate had available at that time, but Reed did not purchase it. On July 15, 2003, Reed met with both Helwick and Madden (collectively, "Allstate's agents") and discussed various variable and fixed annuity products. Helwick stated that Reed told her he had talked to someone at another bank, and it was her impression that he was "shopping" at that point. Reed requested the annuity with the seven percent rate, but Madden stated that it was no longer available. On August 1, 2003, Reed signed an application to purchase a fixed annuity that Allstate sold. He designated as the beneficiary Suzuko Marshall ("Marshall"), a volunteer at AFRH-G with whom he was close friends.

Both prior to and following his purchase of the annuity, Reed had health problems. In June 2003, Reed was diagnosed with lung cancer and told he had only a few months to live; Allstate's agents were aware of this fact. Reed had cognitive problems as early as July 3, 2003 (about a month before the purchase of the annuity), when progress notes indicate that he was confused as to the time of day. In addition, on September 16, 2003, Reed was diagnosed with mild to moderate dementia of the Alzheimer's type.

On January 20, 2004, Parnell and her brother, John Thomas Reed, obtained a power of attorney ("POA") over Reed. On January 25, Parnell found the annuity in Reed's room and discovered that Marshall was listed as the beneficiary. Parnell met with Helwick, showed her the POA, and requested a change of beneficiary form. Helwick refused to give Parnell a form and stated that she would meet with Reed, but she did not do so. Parnell eventually obtained a form from another Allstate agent, and Reed signed it on January 27, making Parnell and John Thomas Reed the beneficiaries. Reed died on January 28, 2004.

After Reed's death, Parnell and Marshall each requested payment of the annuity proceeds. Allstate filed an interpleader action against Parnell, John

Thomas Reed, the Estate of Charles Thomas Reed, and Marshall, seeking a determination of which party was entitled to the proceeds of the annuity. Parnell (both individually and as executrix of Reed's estate) filed a counterclaim against Allstate, alleging breach of fiduciary duty, undue influence, fraud, civil conspiracy, unfair trade practices, and violations of the Mississippi Vulnerable Adults Act, MISS. CODE ANN. § 43-47-8. Parnell sought rescission of the contract or, alternatively, payment of its proceeds to her and her brother as beneficiaries; injunctive relief to prevent Allstate from pursuing similar practices in the future; punitive damages, and attorney's fees. Marshall filed a cross-claim against Parnell, alleging, inter alia, undue influence with respect to the change of beneficiary form. Allstate moved for summary judgment on Parnell's counterclaims, arguing that Parnell had not established the elements of any of her claims. On March 30, 2007, the district court issued an order granting Allstate's motion for summary judgment on Parnell's counterclaims, and on June 14, the court issued an order denying Parnell's motion to alter or amend the judgment. In these orders, the district court found that Parnell could not obtain rescission of the annuity contract because (1) she had failed to set forth any evidence of any of the elements of a fraud claim; and (2) even assuming, arguendo, that a breach of fiduciary duty could justify rescission, she had not set forth any evidence of a fiduciary relationship between Reed and Allstate. The district court also found that Parnell had no standing to obtain injunctive relief and that she could not obtain punitive damages or attorney's fees because she had not suffered actual damages. However, the district court did not specifically discuss any of Parnell's claims other than fraud and breach of fiduciary duty. On July 12, 2007, Parnell filed a notice of appeal.

On December 28, 2007, after a bench trial, the district court entered an order disposing of all remaining claims in the case. The court found that the designation of Marshall as the beneficiary was the product of Marshall's undue

influence over Reed and that the change of beneficiary form designating Parnell and her brother as the beneficiaries was the result of Parnell's undue influence. It therefore found that Reed's estate was entitled to the annuity proceeds. The relief Parnell now seeks is primarily the attorney's fees and expenses Reed's estate has paid in the interpleader action.[3]

## II. JURISDICTION AND STANDARD OF REVIEW

This court has jurisdiction over Parnell's appeal of the district court's order granting summary judgment on her claims against Allstate because that order "would have been appealable if the district court had certified it pursuant to [Federal Rule of Civil Procedure] 54(b) and because the district court did subsequently (and prior to oral argument herein) dispose of all remaining parties and claims." See Young v. Equifax Credit Info. Servs., Inc., 294 F.3d 631, 634 n.2 (5th Cir. 2002).

This court reviews a district court's grant of summary judgment de novo. Madison Materials Co. v. St. Paul Fire & Marine Ins. Co., 523 F.3d 541, 542 (5th Cir. 2008). We may "affirm a grant of summary judgment on any grounds supported by the record and presented to the court below." Hernandez v. Velasquez, 522 F.3d 556, 560 (5th Cir. 2008). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When this court reviews a grant of summary judgment, it views all facts and evidence in the light most favorable to the

---

[3] Parnell was unable to articulate how Reed was harmed by the purchase of the annuity. Indeed, it increased in value in just the short time between its purchase and Reed's death.

non-movant. United Fire & Cas. Co. v. Hixson Bros., 453 F.3d 283, 285 (5th Cir. 2006). However, to avoid summary judgment, the non-movant must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial. Piazza's Seafood World, LLC v. Odom, 448 F.3d 744, 752 (5th Cir. 2006).

## III. DISCUSSION

On appeal, Parnell argues that we must reverse the grant of summary judgment because the district court relied on a ground that Allstate did not raise in its motion for summary judgment. She also contends that she produced evidence sufficient to create a genuine issue of material fact concerning each of her claims.

A. Whether the district court erred by granting summary judgment on grounds not requested by Allstate

Parnell maintains that the district court erred by granting summary judgment to Allstate based on its finding that she could not establish a basis for rescission of the annuity contract. Parnell claims that Allstate "never raised or contested the issue of whether the Annuity could be rescinded" in its motion for summary judgment. She relies primarily on John Deere Co. v. American National Bank, Stafford, 809 F.2d 1190 (5th Cir. 1987). In John Deere, a defendant moved for summary judgment based solely on the ground that a prior court judgment had a res judicata effect against the plaintiff. Id. at 1191. The district court granted summary judgment for the defendant on a theory the defendant had not argued: that the plaintiff had presented no evidence of damages. Id. On appeal, this court found that the damages issue "certainly was not raised by the [defendant] in a manner that would be sufficient to put [the plaintiff] on notice that failure to present evidence of damages could be grounds for summary judgment." Id. The court reversed the grant of summary judgment, stating that "a district court may not grant summary judgment sua sponte on grounds not requested by the moving party." Id. at 1192.

John Deere does not require reversal in this case. In its motion for summary judgment, Allstate discussed each of Parnell's claims and argued that she had failed to establish the elements of any of them. Thus, unlike the plaintiff in John Deere, Parnell was on notice that she needed to produce evidence of the elements of each of her claims in order to survive summary judgment. Moreover, we may affirm a grant of summary judgment on any grounds supported by the record and presented to the court below. Hernandez, 522 F.3d at 560. Therefore, we decline to reverse the grant of summary judgment based on John Deere. Instead, we will examine de novo whether summary judgment was proper on each of Parnell's claims.

B.    Breach of fiduciary duty claim

Parnell claims that Allstate's agents breached a fiduciary duty to Reed by selling him an annuity that was unsuitable for him, failing to explain the hypothetical implications of purchasing the annuity (such as the possibility that he might have to withdraw money from the annuity to pay his taxes), and declining to give Parnell a change of beneficiary form when she requested one.

A plaintiff claiming a breach of fiduciary duty must first establish the existence of a fiduciary relationship by clear and convincing evidence. Smith v. Franklin Custodian Funds, Inc., 726 So. 2d 144, 150 (Miss. 1999). Under Mississippi law, "determining the existence of a fiduciary relationship is a question of fact." Id. However, whether a particular relationship gives rise to a fiduciary duty is a question of law. See Puckett v. Rufenacht, Bromagen & Hertz, Inc., 587 So. 2d 273, 277-79 (Miss. 1991) (answering a certified question from the Fifth Circuit as to whether and to what extent a fiduciary duty exists between a commodities broker and a commodities customer with a non-discretionary account). An ordinary contractual agreement does not give rise to a fiduciary relationship. See, e.g., Peoples Bank & Trust Co. v. Cermack, 658 So. 2d 1352, 1358 (Miss. 1995) ("While one normally does not enter into a

contract with another unless he trusts and has confidence in him, contract and debt amount to a business and not to a fiduciary relationship." (internal quotation marks omitted)), rev'd on other grounds by Adams v. U.S. Homecrafters, Inc., 744 So. 2d 736 (Miss. 1999). However, the Mississippi Supreme Court has held that a fiduciary relationship may arise in certain situations:

> Although every contractual agreement does not give rise to a fiduciary relationship, such relationship may exist under the following circumstances: (1) the activities of the parties go beyond their operating on their own behalf, and the activities for the benefit of both; (2) where the parties have a common interest and profit from the activities of the other; (3) where the parties repose trust in one another; and (4) where one party has dominion or control over the other.

Hopewell Enters., Inc. v. Trustmark Nat'l Bank, 680 So. 2d 812, 816 (Miss. 1996). In addition, "[a] fiduciary relationship may arise in a legal, moral, domestic, or personal context, where there appears 'on the one side an overmastering influence or, on the other, weakness, dependence, or trust, justifiably reposed.'" Lowery v. Guar. Bank & Trust Co., 592 So. 2d 79, 83 (Miss. 1991) (quoting Miner v. Bertasi, 530 So. 2d 168, 170 (Miss. 1988)). In those cases, "such justifiable reliance must have necessarily caused the first party to be lulled into a false sense of security so that the first party did not protect his own interest as he might have ordinarily." Deramus v. Jackson Nat'l Life Ins. Co., 92 F.3d 274, 278 (5th Cir. 1996) (interpreting Lowery).

Although the annuity contract between Reed and Allstate was a contractual agreement, Parnell does not frame her arguments in terms of the Hopewell standard.[4] Instead, she essentially offers four arguments in support

---

[4] Parnell argues that Hopewell should not apply because the annuity contract was not an arms-length transaction; however, that argument is unpersuasive. The purpose of the Hopewell test appears to be to identify those contracts that are not ordinary arms-length

of the existence of a fiduciary duty. As the discussion below demonstrates, none of these arguments are persuasive. Moreover, Parnell cannot satisfy any of the elements of the Hopewell test.

1.      <u>Fiduciary relationship based on trust</u>

Parnell first argues that a fiduciary duty arose because Reed had a relationship of trust with Allstate's agents. Parnell acknowledges that her only evidence of trust or confidence is the fact that Reed met with the agents on three occasions and eventually purchased an annuity from them.

When there is a history of dealings between parties that creates a special relationship of trust and reliance, Mississippi courts sometimes find the existence of a fiduciary duty. In Lowery, the Mississippi Supreme Court considered whether a bank had a fiduciary duty to inform the Lowerys that the credit life insurance they had purchased to secure a promissory note would expire on the note's due date. 592 So. 2d at 85. The Lowerys had a history of dealing with one of the bank's agents with respect to that promissory note and others, as well as with respect to the credit life insurance they had purchased to secure the notes. Id. The court emphasized that the agent "had dealt with the Lowerys on each of their notes," that the agent "was basically their loan officer," that "Mrs. Lowery knew very little about the notes," and that on several occasions the agent had advised the Lowerys about how to handle the notes and insurance. Id. The court concluded that "because of their history of dealings with [the bank] and because the bank placed the notes on hold until Mr. Lowery could come in to take care of them, the Lowerys relied on that relationship and placed trust and confidence in [the bank] to the point of being less vigilant about the coverage of the credit life insurance than they had been in the past." Id. The

---

transactions because they involve mutual benefit, common interest, trust, and control.

court then held that there was a question of fact concerning whether the bank had a fiduciary relationship with the Lowerys. Id.

In contrast, where there is no evidence of a history of prior dealings that would give rise to a special trust relationship, no fiduciary relationship exists. Reliance on the advice of an insurance agent during the purchase of insurance does not create a fiduciary relationship, even where the parties have a prior social relationship. Booker v. Am. Gen. Life & Accident Ins. Co., 257 F. Supp. 2d 850, 860-62 (S.D. Miss. 2003) (holding that individuals who purchased insurance from agents with whom they were socially acquainted could not maintain claims for breach of fiduciary duty because the purchases were merely short-term, arms-length transactions, there was no evidence the agents had provided any advice other than advice related to the purchases of the insurance policies, and there was no history of prior dealings that would have justified the purchasers' relaxed vigilance). Moreover, mere unilateral trust in an agent selling an annuity does not create a fiduciary duty to inform the client of all implications of the transaction. See Pac. Life Ins. Co. v. Heath, 370 F. Supp. 2d 539, 544 (S.D. Miss. 2005) (holding that an individual's unilateral trust that her broker-dealer would explain to her the implications of a variable annuity contract she signed did not establish a fiduciary relationship or a duty to explain the implications of an arbitration agreement in the contract). Similarly, a bank has no fiduciary duty to orally explain all of the implications of a purchase of a Certificate of Deposit. See Union Planters Nat'l Bank, N.A. v. Jetton, 856 So. 2d 674, 677 (Miss. Ct. App. 2003) (reversing a lower court's holding that a bank had a fiduciary duty to explain to a customer the possible negative implications of placing her son's name on her Certificate of Deposit, reasoning, "There were no previous dealings with the bank, this was nothing more than a normal customer/bank transaction and there was no reason for [the customer] to have

justification in a belief that [the bank] owed her some heightened duty beyond that of any other bank and customer under the same circumstances.").

In light of these cases, Parnell cannot demonstrate a fiduciary relationship between Reed and Allstate's agents based on trust. In contrast to the long history of dealings related to financial matters that was present in Lowery, here the only dealings Reed had with Allstate's agents were those related to the purchase of the annuity itself, as well as some social interactions with Helwick. In addition, there is no evidence that Reed actually trusted Allstate's agents or relied on their advice, such that he was less vigilant than he would have been absent a special relationship. The only evidence available is to the contrary—Madden stated that Reed seemed savvy and sharp about investments and that he asked the right questions. Reed's reluctance to give Allstate's agents information about his income and net worth also demonstrates that Reed was not simply entrusting his financial matters to the agents. We reject Parnell's assertion that Reed's meetings with Allstate's agents, combined with his purchase of the annuity, demonstrate evidence of trust; that is the sort of evidence that would be present in almost any commercial transaction and does not suggest a special trust relationship. Like the customers in Booker, Heath, and Jetton, Reed was simply a customer who conducted a single arms-length transaction with some agents. There was no history of prior dealings or other evidence that would have justified him in relaxing his normal vigilance.

2.  <u>Fiduciary relationship based on Reed's physical and mental weakness</u>

Parnell's second argument is that a fiduciary duty arose due to the fact that Reed was mentally and physically weak. She notes that Reed was dying of cancer and that he had experienced cognitive problems—his confusion over the time of day prior to the annuity purchase and his diagnosis of dementia two months after the annuity purchase. Parnell cites two Mississippi cases

suggesting that weakness of mind or body can contribute to a finding of a fiduciary-like relationship. However, those cases do not support Parnell's argument, because they involved strong relationships of trust or dependence in addition to mental and physical weakness. See Miner, 530 So. 2d at 169-71 (holding that an ill ninety-two-year-old man's dependence on his sons for his home, living expenses, physical needs, and doctor visits gave rise to a presumption of a confidential relationship between the father and sons); Bunch v. Shannon, 46 Miss. 525, 526 (1872) (ordering rescission of a land exchange agreement between Bunch and his longtime friend, where Bunch was a man of "mental imbecility and ignorance" who had placed the "most implicit confidence" in the friend, and the friend abused his influence over the "weak, unsuspecting, and confiding" Bunch by arranging for Bunch to receive a worthless deed). Because there is no evidence of trust, confidence, or dependence in this case, and because we find no Mississippi cases supporting the proposition that mental and physical weakness alone can form the basis of a fiduciary duty, Parnell cannot establish a fiduciary duty on this ground.

3. <u>Fiduciary relationship based on Allstate's agents' position as "financial advisors"</u>

Parnell's third argument is that Helwick and Madden were Reed's financial advisors and that a financial advisor has an inherent fiduciary duty to her clients. She cites Western Reserve Life Assurance Co. v. Graben, 233 S.W.3d 360 (Tex. Ct. App. 2007), for this proposition. However, Graben is a Texas case, and we are obligated to follow Mississippi law. In addition, Graben does not support Parnell's position because it involved completely different facts. In Graben, the broker represented himself as a financial advisor who would monitor and manage his clients' investments, he repeatedly provided advice to his clients about their financial plans, and he admitted that he viewed his relationship with his clients as a "very sacred trust" that went beyond mere

mutual benefit. Id. at 365, 373-74. In addition, the clients in Graben told the broker that they were dependent on him for his counsel, advice, and experience, and they actually relied on his advice. Id. at 367. None of those facts are present here. Thus, Parnell cannot establish a fiduciary duty based on Graben.

### 4. Fiduciary relationship based on Allstate's internal documents

Parnell's fourth argument is that Allstate's own internal documents created a fiduciary duty to Reed. Allstate's Marketing Agreement with Hancock states that an agent "shall not recommend the purchase of a Contract to a prospective purchaser unless it has reasonable grounds to believe that such purchase is suitable for the prospective purchaser . . . [A] determination of suitability shall be based on information concerning the prospective purchaser's insurance and investment objectives and financial situation and needs." Parnell argues that these statements created a fiduciary duty obligating the agents to conduct a suitability review before selling Reed the annuity. However, Parnell cites no Mississippi or other authority supporting the proposition that the mere existence of an internal guideline can create a fiduciary duty.[5] Moreover, in a similar case, the Mississippi Supreme Court held that the existence of an industry custom or standard did not establish a fiduciary duty. See Puckett, 587 So. 2d at 281-82 (holding that the fact that commodities brokers had a custom or standard of warning customers against making imprudent trades did not establish a fiduciary duty to make such warnings, at least where there was no evidence that the clients knew about or relied on the custom or standard). We therefore reject Parnell's argument that these documents create a genuine issue of material fact as to the existence of a fiduciary duty. We also reject her argument that the district court impermissibly limited discovery of documents

---

[5] Parnell relies primarily on Rupert v. Clayton Brokerage Firm of St. Louis, 737 P.2d 1106, 1109 (Co. 1987), which is inapposite. The court in Rupert did not use a broker's internal rule to establish the existence of a fiduciary duty. Rather, it used the rule to help establish the breach of a fiduciary duty where the fiduciary duty already existed. Id.

related to Allstate's standards for determining the suitability of annuities, because she has failed to establish that any such discovery could have helped her demonstrate the existence of a fiduciary duty or could have altered the outcome of this case in any other way.

In sum, none of Parnell's arguments support a finding that a fiduciary relationship could exist in this case. The discussion above also establishes that Parnell has not satisfied the Hopewell test for when a fiduciary relationship exists in the context of a contractual agreement. See 680 So. 2d at 816. First, there is no evidence that Allstate's agents went beyond acting on their own behalf at any time when they suggested and discussed annuity purchases Reed might make from Allstate. Second, the parties had no common interest and would not profit from one another's activities, as would have been the case if they had a shared interest in a business venture. Third, as discussed above, there is no evidence that Reed placed any trust in Helwick or Madden beyond that which would be present in any commercial transaction. Fourth, although Reed was physically and mentally weak, and although Allstate's agents were aware of his physical weakness, there is no evidence that Allstate's agents had any dominion or control over him. In sum, there is insufficient evidence to create a genuine issue of material fact concerning the existence of a fiduciary duty.[6] Therefore, the district court did not err in granting summary judgment to Allstate on Parnell's breach of fiduciary duty claim.

C.     Fraud claims

Parnell asserts that Allstate's agents fraudulently induced Reed to purchase the annuity. In Mississippi, a plaintiff claiming fraud must prove the following elements by clear and convincing evidence: (1) a representation, (2) its

---

[6] Because the fiduciary duty did not exist, we need not discuss Parnell's arguments about the ways in which it was allegedly breached or whether rescission would be an appropriate remedy for such a breach.

falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted on by the hearer in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) reliance on its truth, (8) right to rely thereon, and (9) consequent and proximate injury. GMAC v. Baymon, 732 So. 2d 262, 269-70, 275 (Miss. 1999).

Parnell first contends that Allstate's agents made false representations to Reed to pressure him to liquidate his investments and place them into an annuity. She notes that Allstate's agents told Reed on July 7 that he could purchase an annuity paying seven percent but told him on July 15 that the annuity was no longer available. As evidence that the July 15 statement was false, Parnell points to an ambiguous interrogatory response in which Allstate stated that the annuity was available on either August 1 or August 5.[7] She argues that this shows a genuine issue of fact concerning whether the product was available on August 1. However, the material question is whether the annuity was available on July 15, when Allstate's agents stated that it was unavailable. Parnell offers no evidence to show a genuine issue of fact concerning whether the annuity was available on July 15.

Parnell also asserts that Allstate's agents committed fraud by failing to provide Reed with information concerning the suitability of the annuity for a man of his age, health, and expenses. Under Mississippi law, "a claim of fraud by omission arises only where the defendant had a duty to disclose material facts purportedly omitted." Taylor v. S. Farm Bureau Cas. Co., 954 So. 2d 1045, 1049 (Miss. Ct. App. 2007). Such a duty "generally arises only where there is a fiduciary relationship between the parties." Id. As discussed above, there was

---

[7] The interrogatory asked, "Explain whether a . . . variable annuity with a fixed account paying 7% was available for Charles Thomas Reed to purchase on August 1, 2003." Allstate replied, "Yes, [Allstate] had a variable annuity fixed account paying 7% interest on 8/5/03."

no fiduciary relationship between the parties. In sum, therefore, the district court did not err in granting summary judgment on Parnell's fraud claims.

## D. Unjust enrichment claim

Parnell has waived any claim of unjust enrichment, as her brief on the issue contains no citations or legal arguments. See Audler v. CBC Innovis Inc., 519 F.3d 239, 255 (5th Cir. 2008) ("A party waives an issue if he fails to adequately brief it" (internal quotation marks omitted)); see also FED. R. APP. P. 28(a) ("The appellant's brief must contain . . . appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies."). Moreover, even if she had not waived the claim, she cannot prevail because she has produced no evidence that Allstate was unjustly enriched when it accepted Reed's money in exchange for providing him with an annuity. In addition, the annuity agreement was a contract, and unjust enrichment is unavailable where an express legal contract exists between the parties. See Cherry Bark Builders v. Wagner, 781 So. 2d 919, 922 (Miss. Ct. App. 2001).

## E. Deceptive trade practices claims

Parnell asserts that Allstate violated a Mississippi statute prohibiting unfair or deceptive trade practices. See MISS. CODE. ANN. § 75-24-5.[8] Section 75-24-5 prohibits "[u]nfair methods of competition affecting commerce and unfair or deceptive trade practices in or affecting commerce." Parnell argues that Allstate engaged in unfair and deceptive trade practices by (1) promising Reed an annuity paying seven percent interest, (2) passing off the annuity as being suitable for Reed and/or failing to discuss the possible negative consequences it could have for him, and (3) generally engaging in deceptive or unfair trade

---

[8] In the district court, Parnell also alleged violations of Mississippi Code § 83-5-33. Allstate responded by arguing that no private right of action exists under that section. Parnell has not challenged the district court's grant of summary judgment on this ground; accordingly, any alleged error is waived.

practices by luring and pushing Reed to purchase a long-term investment product to make a commission and meet a quota. However, there is no evidence that Allstate's agents promised Reed an annuity with a seven percent rate; the evidence shows only that they told him on one date that the annuity was available, he did not purchase it then, and it was unavailable on a later date. There is also no evidence that Allstate's agents' failure to discuss the suitability of the annuity was "unfair," given that Parnell identifies no Mississippi law that would have imposed a duty on Allstate's agents to conduct such discussions. In addition, there is no evidence that Allstate's agents lured or pushed Reed to purchase the annuity, but only that they offered it as a possibility and he decided to purchase it.

In sum, Parnell has produced no evidence or authority to support her contention that Allstate deceived Reed or that Allstate's actions were unfair within the meaning of the statute. Parnell's unsupported assertion that Allstate's practices were "deceptive" or "unfair" is not sufficient to prevent summary judgment on her § 75-24-5 claim.[9]

## F. Mississippi Vulnerable Adults Act ("MVAA") claim

Parnell contends that when Allstate accepted Reed's payment for the annuity, Allstate violated the provision of the MVAA that states,

> Any person employed by a care facility or having a professional relationship with a care facility who receives or accepts a gift, money, or thing of value in excess of Twenty-five Dollars ($25.00) from a patient or resident of the care facility shall make a written report of the acceptance or receipt of the gift, money, or thing of value to the administrator . . . at the care facility.

---

[9] Parnell asserts that Allstate moved for summary judgment on this claim only on the basis of Parnell's failure to exhaust administrative remedies, not on the merits of the claim. However, Allstate stated in its brief in support of the motion, "Parnell has failed to establish any viable cause of action against Allstate. Inasmuch as Parnell has failed to establish any underlying wrong that would support a claim under this Act, the claim for violation of this Act also fails." We conclude that Allstate properly raised this ground.

MISS. CODE ANN. § 43-47-8(1).  Violation of this provision is a misdemeanor.  Id. § 43-47-8(3).

Even assuming, arguendo, that Allstate's relationship with AFRH-G constitutes a professional relationship with a care facility under the MVAA, Parnell has failed to show that the MVAA provides for a private right of action.  Under Mississippi law, "the party claiming the right of action must establish a legislative intent, express or implied, to impose liability for violations of that statute."  Doe v. State ex rel. Miss. Dep't of Corr., 859 So. 2d 350, 355 (Miss. 2003).  Moreover, "Unless the legislative intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist."  Id. at 356.  The MVAA is penal in nature and provides for criminal penalties for violations of § 43-47-8.  Parnell argues that the MVAA also provides for a private remedy, citing the statement in § 43-47-8(4) that "nothing in this section shall preclude legal proceedings against any person who steals, embezzles or misappropriates the property of such patient or resident or who otherwise exploits such a patient."  We disagree; the more natural reading of § 43-47-8(4) is that the legislature intended to make clear that the MVAA does not preclude existing causes of action, not that it created a new cause of action.  Parnell provides no Mississippi cases or other authority in support of her argument.  After examining the MVAA as a whole, we find no basis from which we can infer a legislative intent to create a private cause of action for violations of § 43-47-8.  Therefore, the district court did not err in granting summary judgment on this claim.

## G.   Civil conspiracy claim

Parnell claims that Helwick and Madden were engaged in a civil conspiracy to defraud, exploit, and/or impermissibly profit from Reed by selling him an unsuitable investment.  In Mississippi, "a conspiracy is a combination of

persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully." Gallagher Bassett Servs., Inc. v. Jeffcoat, 887 So. 2d 777, 786 (Miss. 2004) (internal quotation marks omitted). Parnell cannot prevail on her civil conspiracy claim for two reasons. First, as discussed above, she has not produced any evidence that Allstate planned any acts that were unlawful or that had an unlawful purpose. Second, "[a] corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation." Nelson Radio & Supply Co. v. Motorola, Inc., 200 F.2d 911, 914 (5th Cir. 1953). Here, Helwick and Madden were acting in their capacities as agents of Allstate, so Allstate could not have conspired with them. See Ross v. Citifinancial, Inc., No. CIV.A. 5:01-CV-185BN, 2002 WL 461567, at *11 (S.D. Miss. Mar. 18, 2002) (holding that plaintiffs could not prevail on a claim that individual agents had conspired with their corporate employer where there was "no evidence in the record that the individual Defendants acted outside their employment capacities" (internal quotation marks omitted)). Therefore, the district court did not err in granting summary judgment on this claim.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment to Allstate on all of Parnell's counterclaims.

AFFIRMED.